**DAVID R. REED, State Bar #62479**
Attorney at Law (Automatictrials@yahoo.com)
3699 Wilshire Blvd. Suite 850
Los Angeles, Ca. 90010
(310) 854-5246
(760) 619-2479

Attorney for: CAROLYN VASQUEZ

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | CASE NO: CR-08-1084(A) CBM |
| Plaintiff, ) | |
| ) | |
| -vs- ) | CAROLYN VASQUEZ' SENTENCING |
| ) | POSITION |
| CAROLYN VASQUEZ, ) | |
| ) | |
| Defendant, ) | Date: December 12, 2011 |
| ) | Time: 9:00 a.m. |

---------------------------

TO THE CLERK OF THE ABOVE-ENTITLED COURT and to Jonathan

T. Baum, Trial Attorney, Department of Justice:

Comes now David R. Reed on behalf of Carolyn Vasquez,

and files her Sentencing Position in the case.


Dated: November 14, 2011   Respectfully submitted,

/s/ David R. Reed

_____

David R. Reed for Ms. Vasquez

1

SENTENCING POSITION

I.  **GUIDELINES**

    **A) The Correct Guideline**

    Ms. Vasquez agrees with the advisory guideline calculation in the Pre-Sentence Report ("PSR"). The Base Offense Level is 6, under fraud guideline 2B1.1(a)(2). There is a large 18-point enhancement for the amount of intended losses under 2B1.1(b)(1)(J). There is a 3-point subtraction for "acceptance of responsibility" under 3E1.1(a) and (b). The Total Offense Level is 21, as accurately set forth in the PSR at ¶ 56.

    Ms. Vasquez had her criminal-history score correctly calculated. The court will note that her score just reached the cusp of Criminal History VI, 13 points (PSR ¶82.) Counsel asks the court to vary downward in the Criminal History Category under established case authority, or mitigate Ms. Vasquez' guideline sentence pursuant 3553 factors because a Criminal History VI over-represents the criminal record of this defendant. When a defendant's prior Criminal History Category is over-represented by guideline calculations, the court may depart downward to a more representative Criminal History Category, <u>United States v Lawrence</u>, 916 F. 2d 553 (9th Cir. 1990).

    The government may argue that since Ms. Vasquez engaged in serious criminal activity in this case, and committed a similar kind of crime 20 years ago, her criminal history is not over-represented. Counsel would respond that Ms. Vasquez committed a significant crime here, one that requires at

least two years in prison.  However, in determining an applicable guideline score, we shouldn't mix the "apples" of offense-conduct calculations, i.e. the "seriousness of the crime," which skyrocketed defendant's Base Offense Level with an 18-point enhancement, with the "oranges" of determining an appropriate criminal-history score.

Ms. Vasquez' criminal history is clearly over represented.  Admittedly, 21 years ago, in 1991 (see PSR ¶ 63) Ms. Vasquez had the misfortune of falling in love with a significant con man, Michael Smushkevich.  This diabolical Eastern-European master criminal had a child with Ms. Vasquez.  Mr. Smushkevich got defendant involved in aiding him as well as many others in his massive Medicare fraud scheme.  But, Ms. Vasquez got no money out it, just as she got very little out of the current fraud.  Smushkevich shared almost nothing with Ms. Vasquez.  She was not the profiteer in his crime 20 years ago, rather was treated by him to nice beauty salons, nice nails, French perfume, cocaine, vodka-drenched dinners at Russian restaurants, some clothes, and a few trinkets of knock-off jewelry.  He didn't even buy her the real thing.

After serving her federal prison sentence, she split up with Mr. Smushkevich[1].  Ms. Vasquez successfully served her Supervised Release period.  She thereafter returned to doing cocaine and married another controlling man.  She traveled to

---

[1]  Although, she separated from him, because they have a son together she has had to maintain contact with him over the years, and still does so today.

Northern California and was caught stealing an expensive purse from Nordstrom's in mid 2001 (PSR ¶64.)  That offense could hardly be characterized as the Brinks Train Robbery. She was released on bond, and due in part to her fierce cocaine addiction, she proceeded to steal another purse, one in San Rafael one month later, on 6/21/2001 (PSR ¶ 68; she was granted bond on that case.)  Ms. Vasquez then traveled to Palm Beach, Florida with friends on vacation where she at least wised-up and stole another purse, but a cheaper one! She only committed a petty theft in Florida on 11/10/2011 (¶ 71; she pled guilty and was given one-day in jail.)  She returned to Northern California to face-the-music on her two previous pending purse cases.  She informed her lawyers of her two separate cases, one in Palo Alto and one in San Rafael.  On 5/30/2002 she was sentenced to 6 months in jail in Palo Alto, then transferred to San Rafael and sentenced on 6/3/2002 to 4 months.  These concurrent sentences reaped her 4 separate points even though they were run concurrently.

Ms. Vasquez then moved back to Southern California upon her jail release in late 2002.  In January of 2003, Ms. Vasquez rented a car from Avis.  She kept the rental car past the return deadline, but called the rental car dealership to report that the return would be late.  The problem was, she also didn't pay the added fees (See ¶ 74.)  The car was returned, however. An investigation occurred and, apparently, a warrant was issued in the car case well after September 17, 2003. This assumption is based on the fact that on 9/17/2003, Ms. Vasquez was stopped by police driving a car while having

a suspended license (¶ 77). Apparently, police would have run a standard warrant check and there were no warrants in the system at that time. In short, these crimes are not of the nature and kind deserving of Criminal History VI.

It appears that defendant did not choose to handle her suspended-license case at that time. Two years later, she eventually came to the attention of authorities based on a completely unrelated homicide investigation in which she was only considered a material witness to a dead body found in a storage locker. That took place in 2005. By this time, the warrant for the suspended license was in the system and she was arrested by the investigator and transferred to the Van Nuys court on 12/22/2005. She was sentenced to 10 days in jail with probation for three years (¶ 77.) She thereafter cleared up her rental-car case with the Torrance court on 1/25/2006 (¶ 74). She was given 35 days in jail and placed on three years of probation for that case. As bad luck would have it, based on defendant simply failing to handle her case in a timely fashion she was on two probations stemming from minor offenses she had committed in 2003 when she committed the instant offense. These two misdemeanor probations served to give her yet 2-more points under guidelines.

Ms. Vasquez's problems with her responsibilities to courts were not over. The Palo Alto court, perhaps smarter than the average courts since it's closer to Stanford, caught wind of the problems this defendant was having in Southern California. Ms. Vasquez was violated on her felony probation for the purse she snatched from Nordstroms way back in 2001,

5

four years earlier.  She was sent to prison for 16 months (PSR ¶ 64).

After Ms. Vasquez got out of prison, she was broke, desperate, and met yet another Alpha male, Eastern-European master criminal, Edward Aslanyan, while she was employed at Physician's Safeguard Agency (See PSR ¶ 114).  After she married him, once again, the Medicare Fraud cycle repeated itself.

Now, Ms. Vasquez is much older, much wiser, independent of men, off drugs, employed by caring for a helpless blind man, and she has been out of trouble since committing the instant offenses in 2007 - 2008.  Ms. Vasquez has been drug tested repeatedly while on supervised release over the past 3 years and has not reverted to taking drugs.  Ms. Vasquez has gotten her life back on track.

Ms. Vasquez Criminal History is not that of a person who has a criminal history VI, i.e. typically, dangerous, violent, recidivist drug trafficking offenders, and gangsters who have been repeatedly sent to prison.  Her criminal history is actually pathetic, consisting of street-level purse thefts, but for the Medicare case 20 years ago.  The increases in her guideline score resulted from not following through on court responsibilities. Had Ms. Vasquez simply done what she was supposed to do on her court cases, she would have received many points less than her current score.

No one is arguing that Ms. Vasquez has a minor criminal record, or even a moderate criminal record.  She simply is not a Category VI.  She just reached the cusp of Category VI.

Defendant should not even be a Category V.  Defendant should be a Category IV, a person experienced in the criminal justice system due to small theft offenses and missed court appearances. A Total Offense Level of 21, with a Criminal History of IV = range of 57-71 months.  It is from this range that Counsel asks the court to vary downward based on 3553 factors to a sentence of 24 months.

## II.   ERRORS IN THE PSR OFFENSE-CONDUCT RECITATION

Representations were made in the PSR offense conduct section, which were not true and leave the impression that Ms. Vasquez was a cunning, master-criminal in this enterprise.  To begin with, her problems in these big cases seem to start when she gets married to con men who involve her in their schemes, co-defendants Michael Smushkevich and Edward Aslanyan ("Mr. Aslanyan").  Mr. Aslanyan had Ms. Vasquez work with his close Eastern-European co-criminal, Mr. Armen Shagoyan. These two gentlemen were the masterminds of this operation, spoke mostly Armenian in the presence of Vasquez, and were clearly the profiteers.  They received and kept the money and spent it on expensive Italian and German cars, all the things one would expect from greedy crooks. Aslanyan and Shagoyan involved Ms. Vasquez by having her recruit doctors for their scheme.  They rented a cheap car for her.  Her job was to simply recruit doctors and physician assistants, for which she received a salary.  She did not manage the clinics, rather had a shabby small office provided to her away from the clinics from which she ran advertisements for doctors in newspapers and the internet.

She then interviewed doctors and physician assistants for the clinics and had them meet her co-defendants.

The information in paragraph 9 of the PSR is correct, for the most part.  One of the doctors that Ms. Vasquez hired for the clinics was Dr. Goldstein.  He had a business lawyer who advised him re his employment.  This lawyer insisted with Ms. Vasquez that in order for his client to work at the clinics, he would prepare the employment contracts, not Ms. Vasquez. This lawyer's name was Mr. Michael Dave.  As part of the employment agreement, Mr. Dave insisted that Ms. Vasquez allow him to register her as the CEO, Secretary, and Registered Agent for "Multiple Trading Co."   This was his idea, not Ms. Vasquez', as the government may confirm.  She had no experience in operating corporations, or businesses and hardly knew how register for the 2000 census, let alone register corporate documents with City and the State governments.  After asking Shagoyan and Aslanyan about the demands of Mr. Dave, it was agreed that Attorney Michael Dave could so register her so that her co-horts could employ Dr. Goldstein for their clinics.

The PSR gives the impression that by virtue of Ms. Vasquez being the "CEO of Multiple Trading Co," that she was the leader, the CEO of the fraud.  Nothing could be further from the truth.

The information in paragraph 10 of the PSR is correct for the most part.  Ms. Vasquez would assist recruited doctors to fill-out paper work so that they could obtain Medicare Provider Numbers.  The only help Ms. Vasquez provided to the

doctors to aid them to "open bank accounts," however, was to drive them and drop them off at a bank of their choice, near the clinic.  The doctors went into the bank and opened their own accounts as she waited in the car.  She had nothing to do with the bank-account paperwork process and nothing to do with getting money out of any doctor's account.  The PSR gives the impression that Ms. Vasquez had devised this scheme down to such detail that she even controlled how the money obtained from the Medicare Program would be transferred into the bank accounts of doctors, for whom she prepared all the banking paperwork.  Ms. Vasquez had nothing to do with any billings at the clinics, or where money stolen from the government was sent, or deposited.  Ms. Vasquez also had nothing to do with "marketers" who found Medicare beneficiaries for Aslanyan and Shagoyan.  The money from Medicare went only to Aslanyan and Shagoyan.  Ms. Vasquez would be paid a salary from the ill-gotten gains.  But as she was a conspirator, unfortunately, the loss amount under guideline law is considered foreseeable to her.  This is a factor that will be argued in the 3553 section.

The information in paragraph 12 of the PSR is, again, misleading.  Multiple Trading Co did provide Ms. Vasquez an office, from which she worked to recruit doctors.   Ms. Vasquez had nothing to do with processing fraudulent prescriptions and faked medical documents generated from the clinics at this office.  The fake prescriptions would be sold to others by Aslanyan or Shagoyan.  The fake billings would be sent to a billing company by Aslanyan and Shagoyan and Ms.

Vasquez had nothing to do with this.  From time to time, at the end of a day, Aslanyan or Shagoyan would bring some documents back to her office on their way to the billing company.  However, the impression left in the PSR is one of a witch and her two warlocks (Vasquez, Aslanyan, and Shagoyan) stooped over a black boiling pot in Vasquez' dark office, together placing thousands of fake documents into the pot, stirring them around, and magically millions of dollars pop out into the pockets of the three conjurers.

Paragraph 15 of the PSR is almost completely false with respect to Ms. Vasquez.  She received no "kick backs" from fraudulent diagnostic tests whatsoever.  However, she was on site at the clinics from time to time and she was pressured by Shagoyan to persuade one particular physician assistant she recruited to prescribe as many tests as possible.  That much is true and Ms. Vasquez regrets it.

Lastly, paragraph 29 of the PSR is completely false.  Yes, as a result of having a child together, Ms. Vasquez must still maintain contact with Michael Smushkevich.  When defendant was detained and waiting for her bail reconsideration hearings, she called Smushkevich from MDC, someone she thought might have friends who could help her get out on a property bond.  They discussed her bail plight over recorded MDC phones.  Counsel listened to all the MDC calls in preparation for trial.  Counsel can represent to the court that although there was one vague phone call between Smushkevich and defendant about some topic, there was never any phone call in which defendant openly discussed, "the

fraud scheme at the clinics...and telling [him] that she structured the fraud scheme at the clinics in a way that would allow her and Aslanyan to place the blame for the fraud at the clinics on Espana and the doctors." No such language exists on any call. Perhaps, this error in the PSR, which is unfairly prejudicial, may have been the reason, in combination with the other errors noted above, why the Probation Office has recommended a ten-year prison term.

Ms. Vasquez admits and takes responsibility for the offense conduct she did commit, which is set forth in her factual basis of the plea agreement. She was in charge of a key component of the scheme for it to work. She was paid a salary to find doctors and physician assistants at clinics she knew were conducting fraudulent activities. It was her two co-defendants, however, who reaped the massive benefits for the fraud they engineered and this is a major 3553 factor in asking the court to sentence her to two years in prison. The amount of money the main two co-defendants billed Medicare was fortuitous as far as Ms. Vasquez is concerned. She would have found doctors for the business had it billed two thousand dollars or two million dollars. She had no control over Aslanyan's and Shagoyan's billings or the number of patients seen at the clinics and the money they stole.

**III.  3553 FACTORS**

The court is not only referred to the letter of Ms. Vasquez, which is quite touching, but those of her friends and family. It would seem that Ms. Vasquez has proved that she is no longer a threat to the community. She has

certainly stayed out of trouble since 2008.

Ms. Vasquez has earned 10 dollars an hour for the past several years taking care of a blind man. As the court can see from the attached letters, Ms. Vasquez is doing well. There is no utilitarian or 3553 reason to send Ms. Vasquez to prison for more than two years.

      a)   Punishment to Reflect Seriousness of the Offense.

      The crime involved Ms. Vasquez recruiting doctors and physician assistants for clinics she knew were fraudulently billing Medicare. Although clearly a serious felony which cannot be taken lightly, her role in the crime was not that of the mastermind's and profiteer's. It was completely fortuitous that her co-defendants were billing millions of dollars in claims. Ms. Vasquez did not know what was being billed. She was not reaping the ill gotten gains, other than her salary. Thus, she should not be considered a major federal criminal in terms of the major federal fraud defendants we generally see in our court. Accordingly, the 18 level loss enhancement in this case over represents the seriousness of her particular offense conduct. In view of the fact that 24 months does provide a significant prison term, such a term would not be inconsistent with the seriousness of the crime, considering Ms. Vasquez' role, the fact that she was paid a salary, and the progress she has made since 2008.

      b. Affording Adequate Deterrence

      This crime occurred for the most part in 2007-2008, three-four years ago. Ms. Vasquez has not engaged in any

further criminal conduct and leads a quiet life with her mother and son.  Ms. Vasquez has also been in full compliance on pretrial release and has gotten into no more trouble with the law.  The consideration of sending Ms. Vasquez to prison to deter her from future crime should not be an issue in the case.

      c.  Protecting the Public From Further Crimes of Defendant

      Again, Mr. Vasquez is no longer a danger to the community.  She cares for a blind man, make a meager hourly wage and after serving two years in prison, she will be on a lengthy federal supervised release term with this court.  She clearly knows that if she violates she goes back to prison.  Thus, there should be no issue that she will be out committing more crimes while on supervised release.

      d.  To Provide Needed Education or Vocational Training

      Ms. Vasquez could use some vocational and educational programs while in prison. Although she successfully completed the Betty Ford detox clinic, she could use further counseling in the Bureau of Prison's Residential Drug Abuse Program (RDAP.)

///

///

///

///

///

///

///

13

CONCLUSION

Counsel hopes the court will not send Ms. Vasquez to prison for more than two years.  That is a minimally sufficient prison term.  The court is asked to recommend the RDAP program and a Southern California BOP facility.

Dated: November 14,2011  Respectfully submitted,


/s/ David R. Reed

_____

David R. Reed for Ms. Vasquez